UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| IN RE: AIR CRASH DISASTER OVER MAKASSAR STRAIT, SULAWESI | Lead Docket No. 09-cv-3805<br>MDL No. 2037<br><br>Centralized before the<br>Honorable Marvin E. Aspen |

# MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

This multi-district litigation ("MDL") arises from a plane crash off the coast of Indonesia on January 1, 2007 ("the crash"). Presently before us is Defendants' joint Motion to Dismiss on the Grounds of *Forum Non Conveniens* ("Motion"). (Case No. 09-cv-3805, Dkt. Nos. 65–66.[1]) We grant the Motion.

## I. BACKGROUND

**1. The Crash**

On January 1, 2007, Adam SkyConnection Airlines ("Adam Air") Flight DHI 574 between the Indonesian islands of Java and Sulawesi disappeared over the Makassar Strait. (Dkt. No. 68, Ex. A at 1 [hereinafter "Official Report"].[2]) The plane was a 737-4Q8 manufactured by The Boeing Company ("Boeing"). (*Id.*) Investigators located wreckage from

---

[1] This docket now serves as the master docket for the consolidated MDL. All references to the docket hereafter are to the master docket unless otherwise specified.

[2] The page numbers refer to the original pagination of the Official Report.

-1-

the plane in the waters off the coast of Sulawesi nine days after the plane's disappearance. (*Id.*) There were 102 people on board the plane at the time it disappeared. (*Id.*) All are presumed dead. (*Id.* at 9.)

In the wake of the crash, the Indonesian government conducted an extensive investigation and issued a report on its causes. (Dkt. No. 68 ¶ 9.) The U.S. National Transportation Safety Board ("NTSB") and other international organizations provided assistance in the investigation. (*Id.* ¶ 10.) Boeing served as a technical advisor to the NTSB representative as is apparently common in such investigations. (*Id.*) Based on the Cockpit Voice Recorder ("CVR") and Digital Flight Data Recorder ("DFDR") recovered from the wreckage, the investigators concluded that the pilots experienced "anomalies" with the Inertial Reference System ("IRS") during the flight. (Official Report at 1.) The pilots then "became engrossed with trouble shooting [the] anomalies for at least the last 13 minutes of the flight, with minimal regard to other flight requirements." (*Id.*) During this troubleshooting, the plane's autopilot disengaged and the plane banked to the right and down. (*Id.*) The report continued: "Preoccupation with [the IRS] malfunction . . . diverted both pilots' attention from the flight instruments and allowed the increasing descent and bank angle to go unnoticed. The pilots did not detect and appropriately arrest the descent soon enough to prevent loss of control." (*Id.* at 2.) In short, investigators concluded that the pilots became distracted by the problem with the IRS and stopped flying the plane.

When the pilots did attempt to correct the plane's inadvertent descent, they failed to level the plane's wings first, as is the standard operating procedure. (*Id.* at 1.) As a result, the plane experienced g-forces and airspeeds "beyond [its] design limitations." (*Id.* at 1-2.) Twenty

seconds prior to the end of the recorded data, the CVR recorded a "*thump, thump*" sound and the "[f]light recorder data indicated that a significant structural failure occurred." (*Id.* at 2.)

In addition to pilot error, the report also cited Adam Air's inadequate pilot training and maintenance as contributing causes of the accident. (*Id.* at 2–3, 57–58.) Regarding pilot training, the report concluded that Adam Air had not trained its pilots to deal with IRS malfunctions or to recover from the type of descent the plane experienced. (*Id.* at 57.) Furthermore, Adam Air had been aware of IRS malfunctions with its fleet of Boeing 737s for more than three months but had failed to resolve these maintenance issues. (*Id.* at 58.) As the report stated, "[t]he Adam Air maintenance engineering supervision and oversight was not effective and did not ensure that repetitive defects were rectified." (*Id.*)

Following the accident, Adam Air offered compensation to several of the crash victims' heirs in exchange for signed releases of liability. (Dkt. No. 70, Ex. A.) Although only Adam Air participated in obtaining the releases, the releases purport to absolve all potentially liable parties, including the Defendants in this litigation. (*Id.* at 2–3.) Representatives of forty-six of the fifty-two decedents in this case signed such releases. (Dkt. No. 70 ¶ 3.) The six decedents whose representatives did not sign such releases were members of the crew. (*Id.*) Plaintiffs argue these releases are invalid. (Resp. at 21.)

The crash and subsequent investigation also had numerous consequences for the Indonesian airline industry as a whole. On January 11, 2007, ten days after the crash, the President of Indonesia formed a committee to improve air transportation safety in the country. (Dkt. No. 69 ¶ 84.) Shortly thereafter, the Indonesian Ministry of Transportation audited and rated the safety of all Indonesian airlines. (*Id.* ¶ 85.) Some airlines with a record of poor

performance lost their operating privileges. (*Id.*) In June 2007, the European Union ("E.U.") banned all Indonesian air carriers from E.U. air space. (*Id.* ¶ 86.) Around the same time, the International Civil Aviation Organization ("ICAO") also warned Indonesia that its civil aviation procedures were not up to international standards. (*Id.* ¶ 87.) On July 2, 2007, the ICAO and the Indonesian government signed a joint declaration signaling a commitment to improve the safety of the Indonesian civil aviation system. (*Id.*) This process is ongoing. (*Id.*)

### 2. The Present Litigation

In the meantime, thirty-four representatives of the estates of fifty-two of the decedents have brought these consolidated claims for strict products liability, negligence, and negligent entrustment. (Dkt. No. 32.) None of the decedents were U.S. citizens or residents, nor are their representatives. (Dkt. No. 70 ¶ 7.) Defendants include several U.S. corporations and subsidiaries: Boeing, the plane's manufacturer; World Star Aviation Services, Inc. ("World Star"), the company allegedly in charge of the plane's maintenance; Triton Aviation Ltd. ("Triton"), a subsidiary of co-Defendant Triton Aviation Business Services Holdings, LLC and an alleged owner and lessor of the plane; Wells Fargo Bank Northwest, N.A. ("Wells Fargo Bank"), a subsidiary of co-Defendant Wells Fargo & Company and an alleged owner and lessor of the plane; and Honeywell International, Inc. ("Honeywell"), the manufacturer of the plane's IRS. (Dkt. No. 32 at 8–11; Dkt. Nos. 71–76.) Adam Air, an exclusively domestic Indonesian air carrier, is not a party to this litigation. (Dkt. No. 32; Dkt. No. 68 ¶ 7.)

Plaintiffs initially brought three separate actions that are now consolidated in this MDL. (Dkt. No. 1 at 1.) Two of the actions originated here in the Northern District of Illinois, where Boeing has its corporate headquarters. (*Id.*; Dkt. No. 68 ¶ 23.) Plaintiffs initially filed the

actions in state court, and Boeing removed the actions to federal court with the consent of the other Defendants. (Case No. 09-cv-0556, Dkt. No. 1; Case No. 09-cv-00549, Dkt. No. 3.) The third action originated in the Northern District of California, where Defendants World Star and Triton have their headquarters. (Dkt. No. 1; Dkt. No. 74 ¶ 4; Dkt. No. 75 ¶ 4.) That action also began in state court, although Boeing again removed it to federal court with the consent of the other Defendants. (Case No. 09-cv-3815, Dkt. No. 1.) Boeing then moved for consolidation of these three actions pursuant to 28 U.S.C. § 1407. (Dkt. No. 1 at 1.) The U.S. Judicial Panel on Multidistrict Litigation granted that motion and transferred the consolidated case to us. (*Id*.) Defendants now move to dismiss the consolidated case on the grounds that Indonesia, not this Court, is the more convenient forum. (Dkt. No. 65.)

In support of their Motion, Defendants argue that much of the essential evidence in this case is in Indonesia. (Mem. at 10–13.) Defendants argue that their defenses and Plaintiff's own pleadings implicate the actions of Adam Air in improperly operating and maintaining the downed plane. (*Id*. at 13–14.) Defendants also assert that the evidence of damages for all but two of the over 105 beneficiaries in this case is located in Indonesia. (*Id.* at 15–17.) Furthermore, Adam Air executed liability releases in Indonesia with representatives of forty-six of the fifty-two decedents in this case that Defendants argue are dispositive of Plaintiffs' claims against them. (*Id.* at 17–18.) Because Adam Air and other potential witnesses with knowledge of these issues are in Indonesia beyond the compulsory process of this Court, Defendants argue Indonesia is the more convenient forum for this litigation. (*Id.* at 18–19.) Lastly, Defendants contend that Indonesia has a greater interest in this litigation than this forum, as the crash killed

almost exclusively Indonesian citizens, in Indonesian waters, on an Indonesian air carrier. (*Id.* at 21–26.)

Plaintiffs respond that Indonesia is an inadequate alternative forum due to the allegedly corrupt judicial system there. (Resp. at 12–14.) But even if Indonesia were an adequate forum, Plaintiffs contend that this Court is the more convenient forum because crucial evidence about the design and manufacture of the downed plane is in the U.S. (*Id.* at 15.) This evidence includes documentary evidence and witnesses who participated in the plane's design and manufacture. (*Id.* at 16–17.) Plaintiffs also argue that their choice of forum deserves deference. (*Id.* at 18–19.) Lastly, Plaintiffs claim that the U.S. has at least as great an interest in this litigation as Indonesia, because "the plane, its engine, its Inertial Reference System [IRS], and its other parts were manufactured in the U.S." (*Id.* at 20.)

As a proposed condition of dismissal, Defendants have consented to the jurisdiction of an Indonesian court to hear these claims. (Mem. at 4.) Defendants have also agreed to toll any statute of limitations defense to these claims for 120 days and to provide any evidence in their possession and control that the Indonesian court deems relevant. (*Id.*) Defendants have also consented to honor any Indonesian judgment against them in this matter. (*Id.*)

## II. ANALYSIS

The doctrine of *forum non conveniens* enables a district court to dismiss an action over which it otherwise has jurisdiction when another forum, typically a foreign one, is more convenient. *Clerides v. Boeing Co.*, 534 F.3d 623, 627–28 (7th Cir. 2008). In deciding whether a *forum non conveniens* dismissal is appropriate, a district court must first determine whether an

alternative forum is both "available" and "adequate." *Stroitelstvo Bulgaria Ltd. v. Bulgarian-American Enter. Fund*, 589 F.3d 417, 421 (7th Cir. 2009) ("*Stroitelstvo*").

Where such a forum exists, the district court must then weigh private and public interests in the litigation in determining whether the alternative forum is more convenient. *Clerides*, 534 F.3d at 628 (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508–09, 67 S. Ct. 839, 843 (1947)). The private interest factors that a district court may consider include: "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Id.* The public interest factors that a district court may consider include: "administrative difficulties stemming from court congestion; the local interest in having localized disputes decided at home; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflicts of laws or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty." *Id.* If the district court determines that these factors weigh in favor of the alternative forum, it may dismiss the case at its discretion. *Id.* Having considered these factors in the circumstances of this case, we conclude that dismissal of this case on the grounds of *forum non conveniens* is appropriate.

**1. Indonesia is an "available" and "adequate" alternative forum.**

Defendants argue that Indonesia is an "available" and "adequate" alternative forum for this litigation. (Mem. at 10.) An alternative forum is "available" if all of the parties are "amenable to process and within the forum's jurisdiction." *Stroitelstvo*, 589 F.3d at 421.

Defendants have agreed to consent to the jurisdiction of an Indonesian court as a condition of dismissal in this case. (*Id.* at 4.) Defendants have also offered the affidavit of a purported expert in Indonesian law stating that an Indonesian court would accept Defendants' consent to jurisdiction. (Dkt. No. 69 ¶¶ 34–35.) Based on this consent to jurisdiction, we determine that the Indonesian forum is available. *See Stroitelstvo*, 589 F.3d at 421 (treating consent to Bulgarian jurisdiction as sufficient to establish availability of Bulgarian forum); *Kamel v. Hill-Rom Co.*, 108 F.3d 799, 803 (7th Cir. 1997) (holding the same with respect to a Saudi Arabian forum).

An alternative forum is "adequate" when the parties will not be "deprived of all remedies or treated unfairly." *Kamel*, 108 F.3d at 803. Plaintiffs do not seem to contest Defendants' argument, supported by an expert affidavit, that Plaintiffs would have at least some remedy for their claims under Indonesian law. (Mem. at 11–12; Dkt. No. 69 ¶¶ 68–71.) *See Stroitelstvo*, 589 F.3d at 421 (requiring only "some remedy" be available for the forum to be adequate). Instead, Plaintiffs argue that Indonesia is not an adequate alternative forum due to pervasive corruption in the country's judicial system. (Resp. at 12–13.) In support of this argument, Plaintiffs offer several newspaper articles about corruption in the Indonesian judicial system. (Resp., Exs. 12 (a)–(g).) Two of the seven articles are opinion pieces, however. (*Id.* at (d)–(e).) The other articles tend to focus either on surveys about public *perceptions* of corruption or on generalized concerns about corruption expressed by Indonesian officials and legal observers. (*Id.* at (a)–©, (g).) None of the articles offer concrete proof of corruption, nor do Plaintiffs explain how this generalized corruption would affect their particular case.

Although not new, Plaintiffs' argument, in the words of another district court, "does not enjoy a particularly impressive track record." *Eastman Kodak Co. v. Kavlin*, 978 F. Supp. 1078, 1084 (S.D. Fla. 1997) (collecting cases). Faced with a similar argument about corruption in the Bulgarian judicial system, the Seventh Circuit held that "generalized, anecdotal complaints of corruption are not enough for a federal court to declare that a [European Union] nation's legal system is so corrupt that it can't serve as an adequate forum." *Stroitelstvo*, 589 F.3d at 421. In a case cited favorably by the Seventh Circuit, the Ninth Circuit reached a similar conclusion about alleged corruption in the Phillippines. In that case, the plaintiff offered reports by the U.S. State Department referencing "corruption, judicial bias and inefficiency, and the potentially improper influence that corporate defendants wield over the judicial process." *Tuazon v. R.J. Reynolds Tobacco Co.*, 1179 (9th Cir. 2006) (cited in *Stroitelstvo*, 589 F.3d at 421). Despite these observations from a venerable source, the Ninth Circuit declined to find the judicial system of the Phillippines an inadequate forum. *Id.*

The precedent on which Plaintiffs do rely is neither binding nor analogous. Plaintiffs cite *Doe v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20 (D.D.C. 2005), which dealt with claims that U.S. oil companies aided and abetted the Indonesian army in committing various torts and human rights abuses by paying the army to protect a natural gas pipeline in the country. In denying the defendants' motion for *forum non conveniens* dismissal, the *Doe* court accepted the plaintiffs' argument that they would face "genuine risk of reprisals" in Indonesia for bringing their suit there. *Id.* at 29. As the basis of this conclusion, the court took judicial notice of press reports about the disappearance of other human rights activists in Indonesia. *Id.*

The inadequacy alleged in this case is more like that in *Stroitelstvo* and *Tuazon* than *Doe*, however. The fact that the *Doe* court found Indonesia an inadequate forum in the particular circumstances of that case does not mean that Indonesia is a generally inadequate forum. Furthermore, the connection between the alleged inadequacy in the Indonesian forum in *Doe*—the threat of reprisals for human rights plaintiffs—and the proof of that inadequacy—the disappearance of human rights activists—was much more specific than here. In this case, Plaintiffs' generalized concerns about corruption echo those of the plaintiffs in *Stroitelstvo* and *Tuazon*. As in those cases, Plaintiffs have failed to provide concrete proof of corruption or to connect that proof to their case. Absent such proof, we are reluctant to find the entirety of the Indonesian judicial system so irretrievably corrupt as to render it an inadequate alternative forum. *See Gonzales v. P.T. Palangi Niagra Mitra Int'l*, 196 F. Supp. 2d 482, 488–89 (S.D. Tex. 2002) (holding that "[m]aking a generalized pronouncement condemning the Indonesian court system as 'inadequate' is not the right nor the duty of this Court").

Thus, based on Defendants' consent to Indonesian jurisdiction and their expert's affidavit that Plaintiffs would have some remedy under Indonesian law for their claims, we find that Indonesia is an available and adequate alternative forum for this litigation.

**2. Indonesia is a more convenient forum.**

Having established the threshold requirement of the existence of an alternative forum, we now turn to whether the private and public interests in this litigation make the Indonesian forum more convenient. We believe they do.

**A. The private interest factors favor Indonesia.**

The private interest factors weigh heavily in favor of the Indonesian forum. In particular, "the relative ease of access to sources of proof" and the "availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses" make the Indonesian forum far more convenient. *Clerides*, 534 F.3d at 628. Similarly, the fact that Defendants can implead Adam Air in Indonesia but not here weighs in favor of that forum. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 259, 102 S. Ct. 252, 267 (1982).

Plaintiffs argue that, because their claims sound in products liability, the relevant proof is here in the U.S., where the plane and its component parts were manufactured. (Resp. at 15.) This evidence includes documents pertaining to the design and manufacture of the plane and its component parts, as well as testimony from those individuals who participated in these processes. (*Id.* at 15–16.) But this argument carries little weight in light of the fact that Defendants, as a condition of dismissal, have agreed to make available all evidence in their possession deemed relevant by the Indonesian forum. (Mem. at 4.) Indeed, the Seventh Circuit in *Clerides* considered a similar condition of dismissal of products liability claims arising from a plane crash near the island of Cyprus. 534 F.3d at 629. The Court viewed the condition as undercutting the plaintiffs' argument about the location of the sources of proof favoring a U.S. forum. *Id.* We believe Defendants' willingness to produce evidence in their possession at the direction of the Indonesian forum yields a similar result here. *See also Piper Aircraft*, 454 U.S. at 258–59, 102 S. Ct. at 267 (upholding *forum non conveniens* dismissal in case arising from

plane crash in Scotland even though evidence relevant to products liability claims was in U.S. manufacturers' possession).[3]

Conversely, those in possession of much of the remaining proof, specifically Adam Air and the Indonesian government, are located in Indonesia and have not agreed to produce evidence in this litigation. Based on Plaintiffs' own allegations, the evidence in Adam Air's possession is crucial. For instance, Plaintiffs allege that Adam Air "did not have properly trained pilots and crew, did not have properly qualified and trained maintenance personnel, and did not have an adequate maintenance program." (Dkt. No. 32 at 78.) These allegations echo the conclusions of the Indonesian government's report on the crash. (Official Report at 57–58.) Yet almost all of the evidence about Adam Air's training and maintenance operations, as well as the Indonesian government's investigation thereof, is in Indonesia. (Dkt. No. 68 ¶¶ 17–19.) Other critical evidence collected during the course of the official investigation, such as the CVR and DFDR, is also likely in Indonesia. (*Id.* ¶ 16.) Thus, the location of the sources of proof weighs in favor of the Indonesian forum. *See Clerides,* 534 F.3d at 629 (reaching similar conclusion where evidence related to the airline, flight crew, and post-accident investigation were in foreign forum).

---

[3] Plaintiffs cite an unreported district court case from the Eastern District of Pennsylvania involving products liability claims arising from a plane crash in Indonesia of a U.S.-made plane. (Resp. at 14.) *McCafferty v. Teledyne Cont. Motors, Inc.*, Nos. 03-6729, 03-6730, 03-6731, 2004 WL 185808 (E.D. Pa. Aug. 19, 2004). In that case, the court held that because Plaintiffs' theory of liability sounded in products liability, the "operative facts upon which liability is premised . . . occurred in the United States." (*Id.* At *3.) This case fails to cite *Piper Aircraft*, however—the leading Supreme Court case on *forum non conveniens* arising in a very similar context. (*Id.*) Furthermore, the case is not binding and is contrary to the law of the Seventh Circuit as expressed in *Clerides*, 534 F.3d at 629.

Relatedly, the location of numerous witnesses beyond the compulsory process of this Court weighs in favor of the Indonesian forum. *Id.* The very same persons in possession of any documentary evidence about the pilot training and maintenance operations of Adam Air are also likely to be witnesses. (Dkt. No. 68 ¶¶ 17–19.) Similarly, the Indonesian officials who investigated the crash, as well as those who regulated Adam Air's activities prior to the crash, are also likely witnesses. (*Id.*) Few if any of these individuals are subject to the compulsory process of this Court, because they reside in Indonesia. (*Id.*) On the other hand, the witnesses with knowledge of the design and manufacture of the plane who reside here in the U.S. will be available in the Indonesian forum in light of Defendants' willingness to produce them. (Mem. at 4.) Thus, the comparative ability to produce the relevant witnesses also weighs in favor of the Indonesian forum. *See Piper Aircraft*, 454 U.S. at 242, 102 S. Ct. at 259 (acknowledging the importance of "[w]itnesses who could testify regarding the maintenance of the aircraft, the training of the pilot, and the investigation fo the accident").

As for "other practical problems," Defendants also persuasively argue that the inability to implead Adam Air in this litigation weighs in favor of dismissal. *Clerides,* 534 F.3d at 629. As we discussed, the official report on the crash indicates Adam Air's substantial role in the crash. (Official Report at 1–3.) Yet because Adam Air has never operated in the U.S. nor has it sought to do so, we lack personal jurisdiction over the company. (Dkt. No. 68 ¶ 7.) *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474, 105 S.Ct. 2174, 2183 (1985) (requiring "minimum contacts" with the forum to establish personal jurisdiction). Defendants are therefore unable to implead Adam Air in this action. This situation is similar to *Piper Aircraft*. In that case, the Supreme Court held that "the problems posed by the inability to implead potential third-party

defendants clearly supported holding the trial in [the foreign forum]." 454 U.S. at 259, 102 S. Ct. at 267. That case also dealt with a plane crash in which the plaintiffs claimed manufacturing defects with the plane caused the crash. *Id.* There, as here, the defendants countered that the crash occurred because of negligence by the pilot and the plane's owner and operator. *Id.* Because the defendants could implead the plane's owner and operator in the foreign forum instead of having to seek indemnity later in a separate action, the Court viewed the alternative forum as preferable. *Id.* We believe the same is true here. The fact that Defendants can implead Adam Air in Indonesia weighs in favor of that forum.[4] (Dkt. No. 69 ¶¶ 41–46.)

Lastly, the "possibility of view of premises" is likely irrelevant in light of the fact that the crash occurred over water. *Clerides*, 534 F.3d at 628. In the event it is relevant, this factor favors the Indonesian forum, given that the crash occurred in Indonesian waters. (Official Report at 1.) Thus, the private interest factors relevant to evaluating Defendants' *forum non conveniens* motion all weigh in favor of granting the motion.

### B. The public interest factors favor Indonesia.

The relevant public interest factors also tip decidedly in favor of the Indonesian forum. Specifically, the greater interest of the citizens of Indonesia in this litigation and the unfairness of burdening the relatively disinterested citizens of this forum with jury duty support dismissal.

As an initial matter, Defendants argue that the relevant public interest we ought to consider is that of Illinois and California, where these consolidated claims were initially brought, rather than the generalized public interest of the U.S. as a whole. (Reply at 11–12.) This view

---

[4] The fact that Adam Air may be bankrupt does not alter our analysis. (Dkt. No. 69 ¶ 45.) According to Defendants' expert, Adam Air can still be sued even if it is bankrupt. (*Id.*)

-15-

accords with Seventh Circuit precedent. *See Kamel*, 108 F.3d at 805 (affirming district court's comparison between Indiana residents' interest in the litigation and foreign forum's residents' interest). But whether the point of comparison is Illinois, California, or the U.S. as a whole, the outcome is the same: the citizens of Indonesia have a much greater interest in this litigation.

The reasons why the Indonesian public has a greater interest in this litigation are obvious. The plane crash giving rise to this litigation occurred on an Indonesian domestic flight, operated by an Indonesian domestic air carrier, carrying predominantly Indonesian citizens. (Official Report at 1; Dkt. No. 70 ¶ 7.) Furthermore, this crash had a wide-ranging impact on the Indonesian airline industry and the Indonesian governmental entities that regulate the industry. (Dkt. No. 69 ¶¶ 82–88.) Ten days after the crash, the Indonesian authorities began overhauling the safety measures governing the country's airline industry, a process which continues to this day. (*Id.* ¶¶ 84–87.)

By contrast, the citizens of Illinois and California have a significantly smaller interest in this litigation. Plaintiffs cite the general proposition that a "defendant's home forum always has a strong interest in providing a forum for redress of injuries caused by its citizens." *Reid-Walen v. Hansen*, 933 F.2d 1390, 1400 (8th Cir. 1991). Nevertheless, the Seventh Circuit and the Supreme Court have found this principle unpersuasive in the context of foreign plane crashes involving U.S.-made planes. *Clerides*, 534 F.3d at 630; *Piper Aircraft*, 454 U.S. at 260–261, 102 S. Ct. at 268. Like in *Clerides* and *Piper Aircraft*, whatever general interest U.S. citizens may have in ensuring that products made by U.S. companies are safe pales in comparison to the much more specific interest of Indonesian citizens in evaluating who is responsible for this plane

crash. Accordingly, it would be unfair to burden the citizens of Illinois or California with jury duty in this case given their relative disinterestedness in the outcome. *Clerides*, 534 F.3d at 628.

Furthermore, Plaintiffs essentially concede that we would have to apply Indonesian law were we to hear this case. (Resp. at 20–21.) Instead of disputing Defendants' claim that we would have to apply unfamiliar Indonesian law to at least some aspects of this case, Plaintiffs argue that this Court is "perfectly capable of applying Indonesian laws in this matter if [we] determine[] that [we] must." (*Id.* at 21; Mem. at 25–26.) They conclude that "[t]his factor, therefore, remains neutral." (*Id.* at 21.) But Plaintiffs' argument that we *can* apply foreign law does not mean that doing so would be *preferable*. Indeed, the very factor Plaintiffs describe as neutral shows, by its very terms, a clear preference for "the avoidance of unnecessary problems in conflicts of laws or in the application of foreign law." *Clerides*, 534 F.3d at 628. We need not reach a definitive conclusion on choice of law at this stage because of the already weighty factors favoring dismissal, but we believe this factor, like all the others, would favor dismissal. *In re Air Crash Near Athens, Greece on August 14, 2005*, 479 F. Supp. 2d 792, 805 (N.D. Ill. 2007) (declining to "undertake a lengthy choice of law analysis" where weight of the other factors was clear), *aff'd sub nom. Clerides*, 534 F.3d 623.

And lastly, although court congestion in this forum is not an overly weighty concern, this factor further justifies litigating this case in Indonesia. *Clerides*, 534 F.3d at 628. Defendants offered testimony that similar litigation regarding another air crash in Indonesia has proceeded expeditiously, with trials concluding on some claims within nine months of the first hearing. (Dkt. No. 70 ¶ 15.) The median time to trial for civil cases in this forum was 27.8

months for the one-year period ending September 30, 2009. (*Id*. ¶ 16.) The parties are therefore not likely to obtain a more expeditious result in the United States.

Thus, as with the private interest factors, the public interest factors strongly favor the Indonesian forum.

### C. Deference to Plaintiffs' choice of this forum does not preclude dismissal.

Plaintiffs raise one additional issue: whether deference to their choice of this forum precludes dismissal. In their Response, Plaintiffs cite authority from the Seventh Circuit for the proposition that "there is a strong preference for conducting the litigation in the plaintiff's chosen forum, and that only rare circumstances make honoring this choice inequitable." *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 553 (7th Cir. 2001). (Resp. at 18–19.) As with their analysis of the competing public interests in this litigation, however, Plaintiffs rely on a general principle that is inapposite to the circumstances of this case.

The crucial distinction in this case is that our decision to dismiss this case for *forum non conveniens* would merely send Plaintiffs, all of whom are Indonesian citizens, back to their home forum. (Resp. at 6; Dkt. No. 70 ¶ 7.) The Seventh Circuit has held that, "When application of the doctrine [of *forum non conveniens*] would send the plaintiffs to their home court, the presumption in favor of giving plaintiffs their choice of court is little more than a tie breaker." *Abad v. Bayer Corp.*, 563 F.3d 663, 667 (7th Cir. 2009) (dismissing separate products liability suits against, respectively, U.S. drug companies and U.S. tire manufacturer for injuries sustained in Argentina by Argentine citizens). This modified understanding of the typical deference paid to a plaintiff's forum choice stems not from a bias against foreign plaintiffs but from an assumption about convenience. Again, as the Seventh Circuit has said, "[I]f the plaintiff is suing

far from home, it is less reasonable to assume that the forum is a convenient one and therefore the presumption in the plaintiff's favor applies with less force[.]" *In re Factor VIII or IX Concentrate Blood Prods. Litig.*, 484 F.3d 951, 956 (7th Cir. 2007) (citations omitted). Thus, the deference paid to Plaintiffs' forum choice applies with little force in this case and does not alter the otherwise obvious conclusion that Indonesia is the more convenient forum for this litigation.

### III. CONCLUSION

Indonesia is the far more convenient and proper forum for this litigation. We grant Defendants' Motion and dismiss this case on the grounds of *forum non conveniens*. It is so ordered.

                                                              */s/ Marvin E. Aspen*
                                                          Honorable Marvin E. Aspen
                                                          U.S. District Court Judge

Date: January 11, 2011